IN THE UNITED STATES DISTRICT COURT
IN THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

**ROBERT BRUCE**                                                                 **PLAINTIFF**

v.                     Case No. 2:23-CV-_____

**UNIVERSITY OF TENNESSEE**                                          **DEFENDANT**

## ORIGINAL COMPLAINT

COMES NOW Robert Bruce, by and through his attorneys Chris Burks and Stewart Whaley of WH LAW, for his Original Complaint against University of Tennessee, he does hereby state and allege as follows:

### I. PRELIMINARY STATEMENTS

1. Plaintiff brings this action against the Defendant for violation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S. Code § 2000(e)2 ("Title VII") for declaratory judgment, monetary damages, liquidated damages, prejudgment interest, and costs, including reasonable attorneys' fees, as a result of Defendant's discriminatory actions toward Plaintiff, resulting in adverse employment actions against him.

2. Plaintiff received inequitable treatment and an adverse employment action as a result of his religion, which is Christian, and in retaliation for his complaint about this treatment.

3. Upon information and belief, Defendant has willfully and intentionally committed violations of Title VII, as described, *infra*.

## II. JURISDICTION AND VENUE

4. The United States District Court for the Western District of Tennessee has subject matter jurisdiction over this suit under the provisions of 28 U.S.C. § 1331 because this suit raises federal questions under the Title VII.

5. The acts complained of herein were committed and had their principal effect within the Western Division of the Western District of Tennessee. Accordingly, venue is proper within this District pursuant to 28 U.S.C. § 1391.

6. Defendant does business in this District and a substantial part of the events alleged herein occurred in this District.

7. The witnesses to Title VII violations alleged in this Complaint reside in this District.

## III. THE PARTIES

8. Plaintiff repeats and re-alleges all the preceding paragraphs of this Complaint as if fully set forth in this section.

9. Plaintiff is a resident and citizen of Shelby County, Tennessee.

10. Plaintiff Robert Bruce was employed by Defendant as a resident physician anesthesiologist beginning on or about July 1, 2020.

11. During his employment with Defendant, Plaintiff received adverse employment actions as a result of Defendant's religious discrimination and retaliation, including Defendant prohibiting Plaintiff from performing his regular job duties, placing Plaintiff on unpaid leave, and requiring Plaintiff to repeat months of training above and beyond what Defendant required of any other resident in Plaintiff's program, significantly delaying his graduation date.

12. At all material times, Plaintiff has been entitled to the rights, protection, and benefits provided under Title VII.

13. Defendant University of Tennessee is a state institution of higher learning that includes the University of Tennessee Health Science Center in Memphis, Tennessee, where Plaintiff was employed through the University of Tennessee Graduate Medical Education Program.

14. Defendant is an "employer" within the meanings set forth in Title VII and was, at all times relevant to the allegations in this Complaint, Plaintiff's employer.

### IV. FACTUAL ALLEGATIONS

15. Plaintiff repeats and re-alleges all the preceding paragraphs of this Complaint as if fully set forth in this section.

16. Plaintiff graduated from Ross University Medical School in 2019.

17. Plaintiff completed his first year of residency with the Medical College of Georgia.

18. On or about July 1, 2020, he began the Anesthesiology Residency Program at the University of Tennessee Health Science Center ("UTHSC").

19. This program is accredited by the Accreditation Council for Graduate Medical Education ("ACGME"), which accredits all graduate medical programs in the United States, and follows the requirements of the American Board of Anesthesiology ("ABA").

20. Resident physicians who complete the residency program are granted a certificate of completion and certified as anesthesiologists by the ABA. (This is typically a four-year program; because Plaintiff completed his first year of residency with another institute, Plaintiff was only completing his second, third, and fourth years of residency in Defendant's program.)

21. On July 1, 2021, Plaintiff and Defendant entered into an employment contract for the Plaintiff's third year in Defendant's residency program.

22. Under this agreement, Plaintiff's employment began July 1, 2021 and ended June 30, 2022, and Plaintiff was to receive an annual base salary of $59,004.00.

23. At all times relevant to the events in this complaint, Plaintiff was employed by Defendant as a Resident Physician Anesthesiologist.

24. As part of Plaintiff's employment with Defendant, Plaintiff was required to work under the supervision of attending physicians in clinical settings.

25. Plaintiff had to complete this training to complete his residency requirements, receive the certification of completion for this residency program, and be certified as an anesthesiologist by ABA.

26. Defendant had affiliation agreements with several healthcare facilities in Memphis, including Methodist Le Bonheur Hospitals, the Veterans' Administration Medical Center, Regional One Health Medical Center, and Baptist Memorial Hospital.

27. Plaintiff and other resident physicians worked at these facilities under the supervision of attending physicians.

28. In response to the COVID-19 pandemic, Defendant's affiliated healthcare facilities passed mandates requiring all staff, including resident physicians, to receive vaccinations for COVID-19 (in addition to vaccinations required for other diseases).

29. On November 5, 2021, the Centers for Medicare and Medicaid Services published an Interim Final Rule (IFR) in the Federal Register requiring any clinical facility that receives funds

from CMS (which includes virtually all Defendant's affiliated healthcare facilities) to institute a policy requiring COVID-19 vaccinations for all staff members.

30. This IFR mandated employers subject to its requirements to provide applicable accommodations to employees who had medical conditions, disabilities, or sincerely-held religious beliefs and practices that prevented them from receiving vaccinations against COVID-19.

31. Prior this rule being issued, Defendant mandated Plaintiff and other resident physicians submit proof that they had received COVID-19 vaccinations by an October 2021 deadline in order to continue working at their affiliated hospitals, which required all staff, including resident physicians, receive these vaccinations.

32. Plaintiff began requesting an exemption from Defendant's COVID-19 vaccine mandate immediately after Defendant first publicized this mandate in August or September 2021.

33. Starting on October 17, 2021, Plaintiff informed Defendant that his sincerely held Christian religious beliefs prevented him from receiving COVID-19 vaccinations.

34. The following day, on October 18, 2021, Defendant placed Plaintiff on a performance improvement plan.

35. Plaintiff's exemption request was denied by Defendant. Defendant continued to deny Plaintiff's request until July 2022.

36. Defendant stated that it was prohibited by T.C.A. § 14-2-101 from mandating any persons, including staff and students, receive COVID-19 vaccinations for any reason, including receiving vaccinations as a condition of attendance or employment.

37. T.C.A. § 14-2-101 also forbids "a governmental entity, school or local education agency" from mandating that "a private business or school require proof of vaccination as a

condition to access the private business's school premises or facilities or to receive the benefits of the private business's or school's products or services."

38. As a direct result of Plaintiff's religious objections to receiving the COVID-19 vaccination, on October 31, 2021, Plaintiff was threatened with unpaid leave and termination.

39. On November 1, 2021, Plaintiff was transferred from his clinical rotations to a temporary position in Defendant's Research Department due to the Defendant's failure to grant his exemptions due to religious discrimination.

40. Plaintiff worked in a research position in November and December 2021.

41. In January 2022, Plaintiff was placed on a quality improvement/quality assurance rotation that all residents are required to complete prior to completing their residency programs.

42. In October 2021, Defendant failed to grant Plaintiff his religious exemption request to receiving the COVID-19 vaccine.

43. Defendant failed to consider any other possible avenue that would have allowed Plaintiff to continue to perform his regular job duties on his clinical rotations, telling Plaintiff that the only way he could return to performing these duties was to receive COVID-19 vaccinations, which is against Plaintiff's sincerely-held Christian beliefs, or to receive religious exemptions from all of Defendant's affiliated healthcare facilities.

44. Plaintiff was not, at any point during this period, an employee of Defendant's affiliated healthcare facilities. Plaintiff was at all times employed by the Defendant, which entered into an employment agreement with Plaintiff on July 1, 2021.

45. When Plaintiff attempted to communicate with these facilities on his own, as he was required to do by Defendant, many of the facilities told Plaintiff that they could not grant his

religious exemption request, as he was not their employee, but that they would honor any religious exemption he received from the Defendant.

46. On October 28, 2021, Regional One's Human Resources Officer told Plaintiff that it "was not able to review the exemption requests for UT employees."

47. On January 26, 2022, the Chief Academic Officer of Baptist Memorial Hospital told Plaintiff that he was not legally eligible to apply for either a medical or religious exemption. She further stated, "If your employer (UT) has granted an exemption, we will honor it upon reception of official documentation."

48. However, because Defendant maintained that they were not enforcing any COVID-19 vaccination mandates, Defendant refused to grant Plaintiff a religious exemption.

49. As a result of Defendant's discriminatory actions against Plaintiff, Plaintiff was unable to obtain religious exemptions from the majority Defendant's affiliated healthcare facilities.

50. Instead of supplying Plaintiff a religious exemption request that would have allowed Plaintiff to obtain similar exemptions from Defendant's affiliated healthcare facilities, Defendant continually denied Plaintiff an accommodation based on his sincerely-held religious beliefs.

51. During this period, Plaintiff did request and receive a religious exemption from the Veterans' Administration Medical Center ("VA"), which would have enabled him to work as a resident anesthesiologist at this facility without receiving COVID-19 vaccinations.

52. Instead of allowing him to return to a clinical rotation at the VA, on February 1, 2022, Plaintiff was placed on leave because UT refused to schedule him for any clinical rotations that would allow him to complete his third year of residency as a result of Plaintiff's religious exemption request to the Defendant's COVID-19 vaccination mandate.

53. Plaintiff remained on leave from February 1, 2022 until September 1, 2022.

54. On or about February 2, 2022, Plaintiff received an unsatisfactory evaluation for his Overall Clinical Competence for his July – December 2021 clinical rotation.

55. Plaintiff passed all his clinical rotations. His November and December 2021 rotations were research rotations under the supervision of the Program Director. During this period, Plaintiff was never told that his work was unsatisfactory.

56. Plaintiff received this unsatisfactory evaluation because the Defendant prohibited him from continuing his clinical rotations due to its ongoing religious discrimination and because Defendant was retaliating against Plaintiff for refusing to comply with its mandate and receive COVID-19 vaccinations.

57. As a result of this evaluation, Plaintiff's ability to obtain another residency, if he resigned or was terminated from his residency with the Defendant, was adversely affected. Plaintiff was far less likely to be admitted to a new residency program as a result of this unsatisfactory evaluation and the gross delay the Defendant caused in Plaintiff completing his third-year clinical rotations.

58. Plaintiff was denied the right to appeal this evaluation, which would normally have been appealable under Defendant's internal policies for resident physicians. Defendant informed Plaintiff that an appeal of this evaluation was moot because he was being terminated.

59. However, even if Plaintiff had been terminated, this evaluation negatively affects his ability to obtain another residency, and Plaintiff was damaged by being denied the ability to appeal this evaluation.

60. Since Plaintiff ultimately was allowed to resume his training in Defendant's residency program, this evaluation has further delayed his graduation date, which damages Plaintiff by denying him the higher wages he would otherwise have earned upon graduation and certification by ABA.

61. On February 22, 2022, Plaintiff was issued a Notice of Potential Termination as a result of his inability to complete clinical rotations, even though the only reason he was unable to complete them was because Defendant continually refused to grant him a religious exemption.

62. On March 31, 2022, Plaintiff was issued a Notice of Non-Renewal, based on his continuing "inability to engage in clinical training because of his refusal to be vaccinated or to obtain an exemption from the hospitals." In this Notice, Plaintiff was informed his appointment as a resident would not be renewed and he would be terminated on June 30, 2022, at the end of his contract.

63. This Notice again ignored the fact that the "hospitals" Plaintiff was told to obtain exemptions from largely refused to even review Plaintiff's exemption requests because he was not an employee, and instead told Plaintiff to obtain an exemption request from his employer, the Defendant.

64. Defendant had the ability to grant Plaintiff's exemption request, which would have enabled him to obtain similar accommodations from Defendant's affiliated healthcare facilities, however Defendant repeatedly refused to do so until July 25, 2022, when Plaintiff was finally provided a religious exemption by Dr. Peter Buckley, the Chancellor of UTHSC.

65. On April 4, 2022, Plaintiff was placed on unpaid leave, which was set to end on June 30, 2022, when Plaintiff's employment contract with the Defendant expired.

66. During this period, Plaintiff was able to obtain a religious exemption from Methodist LeBonheur Hospitals ("LeBonheur"), as well as his previous religious exemption from the VA. This enabled him to work as a resident anesthesiologist at these facilities without receiving COVID-19 vaccinations.

67. Even after Plaintiff informed Defendant that his religious exemptions had been granted by LeBonheur and VA, Defendant delayed its reinstatement of Plaintiff to his clinical rotations, telling him to receive similar exemptions from the remaining affiliated facilities.

68. Defendant failed to allow Plaintiff to continue performing his job duties at LeBonheur, even though the facilities themselves were willing to allow him to do so.

69. During this period while Plaintiff was restricted from performing his clinical rotations and placed on leave by Defendant, Plaintiff was prohibited from participating in educational and scholarly activities of his program.

70. Defendant told other resident physicians in Plaintiff's program not to communicate with Plaintiff.

71. Plaintiff was invited to a Zoom call related to his UTHSC employment and residency. He was rejected when he attempted to join the Zoom call and was not allowed to attend.

72. On June 30, 2022, Defendant caused Plaintiff's profile in the ACGME system (which oversees the accreditation of Defendant's residency program) to reflect that Plaintiff was dismissed from his residency program on June 30, 2022.

73. Defendant also removed Plaintiff from their website as an anesthesiologist resident in July 2022.

74. On July 25, 2022, Dr. Peter Buckley, the Chancellor of UTHSC, granted Plaintiff's request for a religious exemption "to the extent that [Plaintiff] viewed any of the University's policies, practices, or procedures as requiring [Plaintiff] provide proof of vaccination or receive the COVID-19 vaccine…."

75. In this letter, Dr. Buckley extended Plaintiff's employment to and including August 31, 2022, even though Defendant had previously noted Plaintiff was dismissed in the ACGME system and removed him from their website.

76. As a result of Dr. Buckley's extension of Plaintiff's employment, he remained on unpaid leave (which started on April 4, 2022) until August 31, 2022.

77. In this same letter, Dr. Buckley specified that this exemption from the COVID-19 vaccinations (which Defendant continued to maintain that it did not mandate Plaintiff or any other persons receive) did not apply to any University-affiliated hospital or other clinical training site, nor did it exempt Plaintiff from his requirement to comply with his essential job functions.

78. On June 23, 2022, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, charging Defendant with religious discrimination as a result of their failure to grant Plaintiff a religious exemption to the COVID-19 vaccine, which resulted in multiple adverse actions against Plaintiff, including Plaintiff being placed on unpaid leave starting April 4, 2022.

79. In August 2022, Defendant's affiliated hospitals were notified that Plaintiff had received a religious exemption from the Defendant in Dr. Buckley's July 25, 2022 letter.

80. As a result, these facilities agreed to honor UT's religious exemption, allowing Plaintiff to return to performing his job duties on his clinical rotations at these facilities.

81. On or about September 1, 2022, after this charge was filed and after Dr. Buckley extended Plaintiff's employment to and including August 31, 2022, Defendant agreed to reinstate Plaintiff into his previous position as a third-year anesthesiologist resident.

82. Even though he was reinstated, Defendant required Plaintiff to repeat, at a minimum, the seven months of clinical training he missed, with possible additional training required due to the length of his absence from the program, which was caused entirely by Defendant's failure to issue him a religious accommodation despite his repeated requests.

83. Further, Defendant placed Plaintiff on a second Performance Improvement Plan ("PIP"), supposedly because of the unsatisfactory evaluation he received on his Overall Clinical Competence for his July-December 2021 rotations. Plaintiff's Program Director told him this PIP was issued due to a "failure to progress" that would have been different "without COVID."

84. Plaintiff received this unsatisfactory evaluation because of Defendant's religious discrimination and retaliation, notably Defendant's refusal to grant Plaintiff's religious accommodation request for COVID-19 vaccinations from October 2021 until July 2022, and its refusal to accommodate Plaintiff by, for example, allowing him to perform clinical rotations at facilities that had granted him religious exemption requests, like LeBonheur and the VA.

85. As a result, Plaintiff was continuously retaliated against by Defendant when Defendant placed him on a PIP due to events that resulted from Defendant's religious discrimination.

86. No anesthesiology resident other than Plaintiff was placed on a PIP for an unsatisfactory evaluation resulting from religious discrimination.

87. Plaintiff completed two clinical rotations successfully in July and August 2021, prior to Defendant instituting its COVID-19 vaccination requirements.

88. Defendant placed Plaintiff on this PIP solely in retaliation for Plaintiff's repeated complaints about religious discrimination, including Plaintiff filing the EEOC charge against Defendant on June 23, 2022.

89. Nothing in Plaintiff's evaluations or completed coursework reflected performance concerns that would have necessitated being placed on a PIP, other than the fact that Plaintiff was unable to complete a large portion of his clinical rotations due to Defendant's religious discrimination.

90. When Defendant allowed Plaintiff to return to clinical training on September 12, 2023, the Program Director of Plaintiff's residency program informed him that he would be eligible to graduate on June 30, 2024. In a September 15, 2023 letter, the Program Director wrote to Plaintiff, "You were advised that with satisfactory clinical progression, you could be graduating at the end of June 2024."

91. Defendant later claimed that ABA guidelines required Plaintiff to complete at least ten months of his third year of residency.

92. ABA's guidelines actually state that its internal Credentials Committee should determine the number of months of training a resident must complete after a "lengthy interruption in training."

93. Plaintiff was told by Defendant that ABA's Credentials Committee recommended Plaintiff complete 23 months of residency training after his return to training on September 1, 2022.

94. On September 29, 2022, Plaintiff filed a second EEOC charge against the Defendant for retaliation, based on Defendant placing him on a PIP on September 12, 2022, and requiring him to restart his third year of residency training.

95. In December 2022, after this second EEOC charge was filed, Defendant told Plaintiff his graduation date would be July 31, 2024, based on the 23 months of residency training recommended by ABA. In the same letter to Plaintiff, Defendant extended his residency training to December 1, 2024.

96. Defendant has continued to be punish Plaintiff for Defendant's religious discrimination, a clear act of retaliation against Plaintiff after his repeated complaints to Defendant and the EEOC.

97. Plaintiff was placed on a third PIP by Defendant while on approved bereavement leave from his program after the death of a family member. Despite the Program Director approving Plaintiff's bereavement leave, he issued him a PIP.

98. Defendant failed to consider the quality improvement rotation or other work completed by Plaintiff during the period that he was prohibited from completing his clinical rotations, even though the quality improvement rotation was a required rotation completed by all residents in his program, and research acceptable to meet graduation requirements in some circumstances.

99. Since 2021, Plaintiff has received numerous adverse employment actions as a result of Defendant's religious discrimination.

100. Defendant denied Plaintiff's request to receive a religious exemption from the COVID-19 vaccination, informing him he had to request exemptions from facilities that were never

his employer. When these facilities informed him they would honor any religious exemption he received from Defendant, Defendant continued to deny Plaintiff the religious exemption he requested.

101. Defendant removed him from clinical rotations required in the third year of Plaintiff's residency program.

102. Defendant placed Plaintiff on unpaid leave from April 4, 2022 until August 31, 2022.

103. When Defendant finally, in July 2022, agreed to issue Plaintiff a religious exemption, this exemption was honored by Defendant's affiliated hospitals, and Plaintiff was able to resume his clinical rotations in September 2022.

104. However, as a result of Defendant's ongoing religious discrimination and retaliation, Plaintiff was required to complete ten additional months of training in his residency program, without any of the work he performed for Defendant after November 2021 being honored.

105. Plaintiff was damaged by the loss of his salary during the period he was placed on unpaid leave, the loss of months of time during which Defendant prohibited Plaintiff from performing his regular job duties, and the loss of additional months of time Plaintiff had to spend in 2022 and 2023 to complete his third year of residency.

106. Plaintiff was also damaged by the unsatisfactory evaluation he received for his Overall Clinical Competence evaluation for his July – December 2021 clinical rotation.

107. Plaintiff's career prospects were damaged and will continue to be damaged in the future as a result of the events described above, in that Plaintiff's completion of his residency has been set back for at least one year, meaning Plaintiff cannot advance in his career in the manner he would have been able to do if he had completed Defendant's program as scheduled.

108. Additionally, Plaintiff was further harassed and suffered ongoing mental and emotional stress as a result of Defendant's repeated threats to dismiss Plaintiff from its program, including Defendant's actions to change his profile in ACGME's site to reflect that he was dismissed by Defendant on June 30, 2022, to remove Plaintiff from its website, and to prohibit Plaintiff from participating in scholarly and educational activities related to his employment.

109. On June 5, 2023, CMS published a final rule, which unwound the provisions of its November 5, 2021 IFR by withdrawing COVID-19 vaccination mandates for staff employed at facilities that received funds from CMS.

110. Even though CMS has ended its COVID-19 vaccination mandates for facilities that receive CMS funds, the damages Plaintiff suffered during the period of time these mandates were enforced by Defendant are severe and ongoing.

111. Defendant's actions were a clear violation of T.C.A. § 14-2-101, which forbids governmental entities and schools from mandating that "a private business or school require proof of vaccination as a condition to access the private business's school premises or facilities or to receive the benefits of the private business's or school's products or services."

112. By requiring Plaintiff to provide proof of vaccination as a condition to access the facilities of "private business[es]" (in this case Defendant's affiliated hospitals), Defendant did enforce a vaccination mandate starting in October 2021.

113. As a result of Defendant's actions, Plaintiff was denied the "benefits of the private business's or school's… services," as he did not receive the clinical training he would otherwise have received on his clinical rotations at Defendant's affiliated hospitals from October 2021 until July 2022.

114. Even during the period when Plaintiff received religious exemptions to the COVID-19 vaccine from LeBonheur and the VA, Defendant refused to allow Plaintiff to resume his clinical training at those facilities.

115. Defendant employs similarly situated resident anesthesiologists who did not request religious exemptions to receiving the COVID-19 vaccine.

116. These similarly situated residents were able to continue to perform their job duties in clinical settings throughout 2021 and 2022.

117. These similarly situated residents were not transferred to research positions, placed on leave and unpaid leave, or harassed by Defendant and threatened with dismissal from their residency program.

118. These similarly situated residents were not given unsatisfactory evaluations because they were prohibited from completing clinical rotations.

119. These similarly situated residents did not file complaints or EEO charges against Defendant for religious discrimination and retaliation.

120. These similarly situated residents were not required to repeat their third year of residency or placed on performance improvement plans as a result of a negative evaluation.

121. These similarly situated residents were not removed from Defendant's website, nor did they have their profile on ACGME's site altered to show they were dismissed from Defendant's residency program.

122. These similarly situated residents were able to complete their third year of residency and will graduate on time without the marks on their academic records that will negatively impact Plaintiff in the future.

123. As a result of the ongoing discrimination Plaintiff experienced as a result of his religion, which is Christian, and in retaliation for his complaints and his EEOC charge, Plaintiff has experienced ongoing adverse employment actions that resulted in a reduction to Plaintiff's pay and damages to his reputation, his academic record, and his future employment prospects.

## V.  FIRST CLAIM FOR RELIEF – Title VII Claims

124. Plaintiff repeats and re-alleges all the preceding paragraphs of this Complaint as if fully set forth in this section.

125. Plaintiff filed timely charges with the EEOC, received right to sue letters, and thus exhausted his administrative remedies.

126. Defendant engaged in unlawful employment practices at their facility in Memphis, Tennessee, in violation of 42 U.S. Code §2000e-2.

127. Specifically, and as detailed above, Plaintiff, who is a Christian, was threatened with termination, placed on administrative leave, placed on unpaid leave, deprived of training opportunities, and required to repeat months of his clinical training, delaying his graduation date, as a result of ongoing religious discrimination and retaliation.

128. Defendant employs non-Christian residents who were not subject to the same treatment that Plaintiff experienced during his employment.

129. As a result, Plaintiff was treated disparately from Defendant's non-Christian employees.

130. At all relevant times, Plaintiff could perform the essential function of the position for which he was hired.

131. However, as a result of Defendant's religious discrimination and retaliation, Plaintiff experienced adverse employment actions in the relevant statutory period.

132. The effect of the practices complained of above have been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as a resident physician because of his religion.

133. The unlawful employment practices complained of above were and are intentional.

134. The unlawful employment practices complained of above were done with reckless indifference to the federally protected rights of Plaintiff.

135. Pursuant to Title VII of the 1964 Civil Rights Act, as amended, Plaintiff is entitled to, and he seeks, an additional amount as compensatory and punitive damages equal to the sum of his lost wages or salary, benefits and/or other compensation denied or lost to him by reason of Defendant's violations of Title VII, plus any interest he is entitled to for these causes, because Defendant's action were malicious and Defendant had no reasonable grounds for believing that its actions were not in violation of Title VII.

## VI.    PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiff Robert Bruce respectfully prays that Defendant be summoned to appear and to answer herein as follows:

(A) A declaratory judgment that Defendant's practices violate Title VII of the Civil Rights Act of 1964, 42 U.S. Code § 2000(e)-2 and the related regulations;

(B) An order directing Defendant to pay all compensation, compensatory, and punitive damages to Plaintiff along with pre-judgment interest, reasonable attorney's fees, and all costs connected to this action;

(C)     Such other and further relief as this Court may deem necessary, just and proper.

          Respectfully submitted,

          **Robert Bruce, PLAINTIFF**

          WH Law
          Memphis Office
          901.641.4199

By:  Chris Burks (ABN: 2010207)
    chris@wh.law
    Stewart Whaley (ABN: 2009084)
    stewart@wh.law

    Mailing Address:
    1 Riverfront Place, Suite 745
    North Little Rock, AR 72114